R. Jeremy Adamson (12818)
Taylor J. Smith (17537)
**KUNZLER BEAN & ADAMSON, PC**
50 West Broadway Ste 1000
Salt Lake City Utah 84101
Telephone: (801)994-4646
*jadamson@kba.law*
*tsmith@kba.law*

*Attorneys for Plaintiff and*
*Counter-Defendant*

---

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| NURSA, INC., a Utah corporation, <br><br> Plaintiff, <br><br> v. <br><br> OXFORD VALLEY HEALTH, LLC, a New Jersey limited liability company, <br><br> Defendant. | **MOTION TO DISMISS COUNTERCLAIMS** <br><br> Civil Case No. 2:24-cv-00052-DBP <br><br> Honorable Judge Dale A. Kimball <br><br> Magistrate Judge Dustin B. Pead |
| OXFORD VALLEY HEALTH, LLC, a New Jersey limited liability company, individually and as a representative on behalf of other similarly situated persons, <br><br> Counter-Plaintiff, <br><br> v. <br><br> NURSA, INC., a Utah corporation, <br><br> Counter-Defendant | |

Pursuant to Fed. R. Civ. P. 12(b)(6) and DU Civ. R. 7-1, Plaintiff and Counterclaim

Defendant Nursa, Inc. ("**Nursa**"), by and through counsel, hereby moves the Court to entirely and prejudicially dismiss Defendant Oxford Valley Health, LLC's ("**Oxford**") Class Action Counterclaim [ECF No. 13], ("**Counterclaim**").[1]

## INTRODUCTION OF RELIEF REQUESTED AND GROUNDS THEREFOR

As a matter of substantive Utah law, "[p]arties are entitled to contract on their own terms without the intervention of the courts to relieve either party from the effects of a bad bargain." *Monaco Apartment Homes v. Figueroa*, 2021 UT App 50, ¶ 10, 489 P.3d 1132 (internal quotations and citations omitted). That is, courts "will not make a better contract for the parties than they have made for themselves." *Bakowski v. Mountain States Steel, Inc.*, 2002 UT 62, ¶ 19, 52 P.3d 1179. And in the presence of unambiguous language, courts will not "allow the parties to change or rewrite their original agreement." *Zions Mgmt. Servs. v. Rec.*, 2013 UT 36, ¶ 32, 305 P.3d 1062 (internal quotations and citations omitted). But this is exactly what Oxford's Counterclaim is asking the Court to do.

On their face, Oxford's pleadings 1) admit the existence of a binding contract (the "**Nursa™ Terms of Service Agreement**", "**Terms of Service Agreement**," or "**Agreement**")—a fact which disposes of their unjust enrichment claim; 2) admit the Agreement's inclusion of terms referenced in Nursa's Complaint [ECF No. 1]; 3) exclude any allegation that the Agreement is ambiguous or subject to alteration; and 4) fail to allege that Nursa actually breached any described term of the Agreement. Although the Counterclaim unequivocally communicates Oxford's dissatisfaction with the Agreement, this is insufficient to levy a cause of action. Accordingly, the

---

[1] Nursa also disputes the adequacy of the class allegations but reserves the right to seek their dismissal or amendment pursuant to Fed. R. Civ. P. 23 either independently, or as part of the class certification process.

Court should dismiss all three causes of action with prejudice.

## RECITATION OF FACTS

For this motion, and this motion only, the following allegations from, and as numbered in, the Counterclaim are assumed true:

5.      Oxford is a skilled nursing facility healthcare service provider located in Arizona and Nevada that provides various services with a focus on behavioral health related care.

6.      Nursa is a software company that connects healthcare facilities with healthcare clinicians operating as independent contractors who use Nursa's software application ("**App**").

7.      Nursa's App allows subscribed healthcare facilities to post various job shifts to be filled by independent healthcare clinicians.

8.      Thereafter, the healthcare clinician can select and apply for the job posting through the App, allowing the healthcare facility to review and approve the clinician candidate.

9.      The App will also present an estimated charge for the shift posted, depending on various factors.

10.     Once approved, the healthcare facility must click "I Agree" on the App that triggers the Nursa$^{TM}$ Terms of Service Agreement … .[2]

11.     After the clinician completes the work, Nursa provides a shift report to the healthcare facility for its review.

12.     Nursa's overbilling scheme begins with its impractical 48-hour shift report verification process, which states as follows:

---

[2] Both Nursa and Oxford attached the Agreement to their pleadings and by so doing incorporated the Agreement therein. The Agreement is also attached hereto, for convenience, as Exhibit 1.

Facility shall review and verify shift reports upon submission from a Clinician. In the event that shift reports are not reviewed nor verified by the Facility with 48 business hours, the parties shall accept auto-verified shift reports. Any auto-verified shift report shall be deemed accepted by the parties as true and correct.

(Agreement, § 9(a)).

13.     If a healthcare facility contests the shift report, Nursa imposes a lengthy and arduous challenge process that entails, among other things, scrutinizing each line item only to have Nursa place the blame for any errors or omission back on the healthcare facility.[3]

14.     Once a shift report has been "verified" and "deemed accepted," as described above, Nursa finalizes the charges, pays the clinician for the work completed, and invoices the facility.

15.     Nursa's invoices routinely include over 100 individual shift entries that each include, among other things, the (i) job ID; (ii) clinician's personal information; (iii) total hours worked; (iv) total time for any breaks taken during the shift; (v) billing rate; and (vi) the amount billed.

16.     The healthcare facility has thirty (30) days from the date of the invoice to notify Nursa in writing of any errors, charges, omissions, or corrections among the hundreds of shift entries. (Id., § 9(d)).

17.     Should the healthcare facility fail to timely notify Nursa of any overbilling concerns, "all Charges shall be deemed correct, accurate, and without objection," and Nursa imposes a late fee equating to "the lesser of 1.5% per month of the unpaid balance (multiplied

---

[3] The Counterclaim is riddled with legal conclusions disguised as allegations. Apart from the recitation of the Agreement, paragraphs 12 and 13 provide two examples of this tendency. The Court need not accept these as true. *Mortensen v. Church Fam. Tr.*, No. 2:07CV006, 2007 WL 9797488, at *2 (D. Utah July 25, 2007) ("Although the court accepts factual allegations to be true for purposes of a motion to dismiss under Rule 12(b)(6), the court need not accept legal conclusions as true.").

against your bill balance and compounded daily), or the highest rate permitted by law." (Id., § 9(e)).

18.    In or around June 2022, Oxford began utilizing Nursa's services through its App.

19.    Oxford used the App to find clinicians to work at its three facilities, including Desert Peak Care Center; Mission Pines Nursing and Rehabilitation; and Mountain View Care Center.

20.    During this period, clinicians selected shifts posted by Oxford on the App and, after being approved by Oxford, worked those shifts at healthcare facilities operated by Oxford.

21.    For each week during the relevant period, Nursa sent Oxford an invoice for services rendered for these facilities.

22.    In or about August 2023, Nursa claimed that Oxford had an unpaid principal balance of $4,221,488.99 and $440,134.46 in accrued late fees, for a total amount of $4,661,583.45.

23.    In response, Oxford spent significant time and resources to perform a detailed internal audit of the invoiced shifts supporting the purported outstanding balance for the Oxford facilities.

24.    Oxford's audit included a careful view of dozens of the invoices, which, as stated above, typically include 100 individual shift entries for a single invoice.

25.    As such, Oxford tediously reviewed and meticulously reconciled, line by line, each shift billed in the invoice, while cross-referencing those specific entries with Oxford's facility records.

26.    After completing the audit process, Oxford discovered an alarming amount of

overbilling by Nursa.

28.    By way of example, based on invoices for August and September of 2022, of the 600 separate line items/job shifts invoiced for the two months, Oxford has no record of approximately 203 of the job shifts (or 33%) confirming that the clinician actually showed up and completed the requisite work.

29.    Upon information and belief, a substantial portion of the job shifts did not have any clock in/out records, or any other form of documentation to substantiate that the clinician performed the work during the invoiced shifts.

30.    Upon information and belief, a significant number of clinicians either did not show up for the invoiced shifts, or did not work their full shifts.

31.    Upon information and belief, video records from the Oxford facilities will verify that Nursa consistently billed Oxford for shifts in which the clinicians either did not show up or did not work their full shifts.

32.    Consequently, Nursa billed Oxford for healthcare services that were not rendered.

33.    Oxford notified Nursa, on multiple occasions, of its pervasive overbilling and Oxford's alarming discovery that a substantial portion of the invoices included work that was never performed.

34.    Consistent with its allegations in the Complaint, Nursa refused to take a proactive approach to investigate these serious issues, but conveniently relied on the 48-hour audit provision under the Agreement to claim that the shifts reports were deem "accepted" regardless if the work was actually performed.

36.    Additionally, Nursa charged for cancellations and "urgent" booking well above a

reasonable market rate.

37.     Oxford explained to Nursa that it is impossible to comply with the 48-hour audit requirement, given the volume of Nursa's overbilling and questionable shift reports.

38.     Likewise, even when Oxford timely contested the shift reports within the 48-hour audit window, Nursa's process to contest the invoiced shifts is lengthy, tedious, and very difficult to comply with.

39.     So, making matters worse, while Oxford attempted to comply with Nursa's process to contest the past invoices, Nursa continued to send the new shift reports and weekly invoices that were filled with more errors and rampant overbilling.

40.     Nursa created a scheme under which it overzealously invoiced Oxford if there was even the mere possibility that a worker fulfilled even a portion of the shift; aggressively enforced the 48-hour audit period that was impossible for Oxford to comply with given the volume of questionable shifts and billing; and intentionally created a time-consuming and inefficient process for Oxford to contest its billing practices.

## LEGAL STANDARDS

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim for relief that is plausible on its face. A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. … Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotations and citations omitted). In undertaking this analysis, courts may consider "documents

referred to in and central to the complaint, when no party disputes its authenticity." *Clinton v. Sec. Benefit Life Ins. Co.*, 63 F.4th 1264, 1275 (10th Cir. 2023) (internal quotations and citations omitted). But courts need not assume the truth of legal conclusions, *Iqbal*, 556 U.S. at 678, bare assertions, *id.* at 681, or conclusory allegations, *Stokes v. Mountain Am. Fed. Credit Union*, No. 2:10-CV-27 TS, 2010 WL 2720739, at *1 (D. Utah July 8, 2010). "Factual allegations that contradict a properly considered document are not well-pleaded facts that the court must accept as true." *Matney v. Barrick Gold of N. Am.*, 80 F.4th 1136, 1145 (10th Cir. 2023) (internal alterations, quotations, and citations omitted). Where the well-pleaded factual assertions do not support the proposed claim, the proper course is dismissal. *See Iqbal*, 566 U.S. at 680.

## ARGUMENT

Oxford has failed to assert plausible allegations against Nursa. According to Oxford's own description of the facts, Nursa has not breached the terms of any agreement between the parties. Thus, the breach of contract claim fails. Moreover, Utah substantive law does not allow Oxford to seek relief for implied contractual covenants that go above and beyond the expectations justified by the contract itself. As such, the claim for breach of implied covenant of good faith and fair dealing does not constitute a claim upon which relief can be granted. Finally, both Nursa and Oxford agree upon the existence of a binding agreement, the terms of which are apparently undisputed in the pleadings. Thus, Oxford cannot obtain equitable relief like that provided by unjust enrichment. For all of these reasons, the Counterclaim should be dismissed.

## I.    OXFORD FAILS TO ALLEGE THAT NURSA BREACHED ANY OF THE AGREEMENT'S ACTUAL TERMS

Oxford has not alleged that Nursa breached any terms of the Agreement that have been described in the Counterclaim or that can actually be found in its language—thus, the breach of

contract claim must be dismissed.

"The elements of a prima facie case for breach of contract are (1) a contract, (2) performance by the party seeking recovery, (3) breach of the contract by the other party, and (4) damages." *Richards v. Cook*, 2013 UT App 250, ¶ 7, 314 P.3d 1040. "To properly state a claim for a breach of contract, a party must allege sufficient facts, which this court views as true, to satisfy each element." *Total Quality Sys., Inc. v. Universal Synaptics Corp.*, 679 F. Supp. 3d 1196, 1207 (D. Utah 2023) (internal alterations, quotations and citations omitted). Where an undisputed copy of an agreement has been submitted as an exhibit to a complaint, the Court may consider the document to determine the consistency between the pleadings alleged and the actual language of the contract. *Id.* at 1208–09. When deciding whether a breach has occurred "the legal effect of [an] agreement is to be determined by its terms rather than by the allegations of the pleader." *Id.* at 1208 (internal alterations, quotations, and citations omitted). "This means that, although [the court will] accept all well-pleaded allegations as true and draw all reasonable inferences in favor of the plaintiff, if there is a conflict between the allegations in the complaint and the content of the attached exhibit, the exhibit controls." *Id.*

For example, in *Milestone Electric*, a Texas-based corporation alleged breach of contract against a Utah telephone answering service. *Milestone Elec., Inc. v. Nice inContact, Inc.*, No. 2:20-CV-00630-TC-JCB, 2021 WL 5007707, at *1 (D. Utah Oct. 28, 2021). Following dismissal of its initial claim, the Texas-based corporation amended its claims but failed to point toward any new contractual term it alleged had been breached. *Id.* at *3. As such, the only allegations before the court were assertions that the Utah telephone answering service had breached the contract, and because the Texas-based corporation had failed "to set out what those breaches" were, the Court

was obligated to dismiss the claim. *Id.*

Here, the parties do not disagree that an enforceable contract has been created. Indeed, Nursa pled factual allegations describing the bases for the contract and the parties' assent, finally stating "The Agreement is a valid and enforceable contract between Nursa on one hand, and Oxford on the other." *Complaint*, ¶ 42; *see also id.* ¶ 1. And Oxford has similarly stated, "In or about June 2022, Oxford and Nursa entered into the Agreement, which is a valid and binding contract." *Counterclaim*, ¶ 62. Both the Complaint and the Counterclaim define "Agreement" to mean the Nursa™ Terms of Service Agreement, which was attached to both as Exhibit 1. Complaint, ¶ 1, Exh. 1; Counterclaim, ¶ 10, Exh. 1. But when comparing the allegations in the Counterclaim to the Agreement itself, Oxford has entirely failed to allege that Nursa breached the terms of that Agreement.

Oxford enumerates four bases for its breach of contract claim, "(i) charging Oxford for healthcare services that were not rendered; (ii) overcharging for cancellations and 'urgent' booking well above a reasonable market rate; (iii) refusing to reimburse Oxford for healthcare services that Nursa knew, or should have known, were not rendered; and (iv) failing to investigate whether it charged for healthcare services that were not rendered, despite receiving written notice from Oxford." *Counterclaim*, ¶ 64. But in light of the facts alleged, none of these constitutes a breach of the contractual terms described in the Counterclaim or found in the Agreement, and in fact, contradicts them.

First, as to the claim that Nursa has charged for healthcare services that were not rendered, Oxford's factual allegations, *see generally, Counterclaim*, and the Agreement itself make clear that Nursa is not actually rendering any healthcare services and Nursa has no control over any

healthcare services a clinician actually renders or that a facility instructs a clinician not to render, *Agreement* §§ 2, 8(a), 8(f), 9(b). Rather, Oxford's factual allegations and the Agreement both establish that Nursa is only a facilitator that connects facilities with clinicians so that clinicians can render healthcare services. *See generally Counterclaim*; *see also Agreement* §§ 2, 8(a), 8(f), 9(b). Moreover, the Agreement makes clear in sections 9(a) and 9(d) that charges are not contingent upon the services actually being rendered but are instead triggered based on information entered by the clinician and verified by the facility, whether manually or through auto-verification. And this makes sense—after all, besides the information provided by the clinician and the facility, it is essentially impossible for Nursa to otherwise obtain information regarding whether the services reported in the app were actually rendered. This is exactly why the Agreement allocates those obligations, and the risk of compliance, to the facility. Nursa is a software provider—Nursa is not on location, does not monitor who showed up for a shift, how long they stayed, whether they took a break or lunch, whether they were released, or what services they performed. *See e.g.*, *Agreement* §§ 2, 8(a), 8(f), 9(b). The only access to this information is provided through the App by the clinician then verified by the facility. *Agreement*, § 9 (a) ("The Facility shall review and verify shift reports upon submission from a Clinician."). The contract clearly and intentionally allocates to the facility the risk of inconsistencies between shift reports and services actually rendered by explaining that charges will be generated on a per-shift basis, *id.* § 9(d), then by obligating the facility to verify the shift reports to confirm that what has been reported is exactly what happened, *id.* § 9(a). Put shortly, the contract never states that Nursa *would not* charge for services that were not rendered, but only that it *would* charge for shift reports that have been verified. This alleged breach is not based on a term found in the Agreement.

Second, Oxford asserts that Nursa has been "overcharging for cancellations and 'urgent' booking well above a reasonable market rate." *Counterclaim*, ¶ 64. Put another way, Oxford has not alleged that Nursa charged more than the parties originally agreed upon, but rather that the price agreed upon for the services was so exorbitant that the contract was breached by that very cost—despite Oxford's assent to those charges. However, Nursa is under no obligation, either under the contract, or by law, to restrain the cost of its services. The phrase "market rate" does not appear even once in the Agreement, and the cancellation and urgent booking charges contained therein were there for Oxford to either accept or reject. *See Agreement*, §§ 9(d) (describing fluctuating pricing depending on demand), and 9(f) (describing cancellation charges). As Oxford has alleged, it accepted these charges and entered into a binding contract. Moreover, by posting shifts, it agreed to the estimated charges for those particular shifts. *Id.* § 9(d). Oxford's complaint about the cost of the services for which it agreed to pay does not provide a basis for its claims against Nursa.

Third, Oxford attempts to allege breach by claiming that Nursa has refused to reimburse Oxford for healthcare services that went unrendered. But the phrase "reimburse" also does not appear in the Agreement, and Oxford does not even allege that it has actually paid for any of the services for which it purportedly seeks reimbursement based on a non-existent and undefined purportedly contractual term. Again, as explained, the charges are what the charges are, and it was Oxford's obligation to verify the charges within forty-eight hours, then pay for the charges invoiced based on the verified reports. *See id.* §§ 9(a), (d). Oxford committed to comply with these obligations by entering into the Agreement and had these terms available beforehand for its review. Nursa bears no fault for Oxford's inability to comply with Oxford's contractual obligations. Nursa

did not dictate the number of shifts Oxford listed on the App (and thus did not control the number of line-items which Oxford would have to review), Nursa did not control Oxford's decision to continue submitting shifts despite the growing number of items to review, and Nursa did not control Oxford's ability, desire, or diligence in reviewing the shifts. Indeed, Oxford's assertions on this point show that Oxford had the ability to self-audit the shifts at issue. *Counterclaim*, ¶¶ 22–25. Oxford cannot now support a claim against Nursa by complaining Nursa did not reimburse Oxford for shifts Oxford now claims were not completed. Nursa has no contractual obligation to provide such reimbursements.[4]

Fourth, and finally, Oxford accuses Nursa of breaching the contract by "failing to investigate whether it charged for healthcare services that were not rendered, despite receiving written notice from Oxford." *Id.* ¶ 64. As the parties have stipulated in their filings, shift-reports were subject to dispute within forty-eight hours, *Agreement*, § 9(a), and invoices were subject to dispute within thirty days, *id.* § 9(d). Oxford has not asserted that it contested any shift report within forty-eight hours or any invoice within thirty days. Instead, Oxford asserts only that it audited the invoices and shifts *after* Nursa called for the debt to be paid, and that it then notified Nursa of its "discovery." *Counterclaim*, ¶¶ 18–23, 33. Again, as alleged, Oxford has not pointed to a single term of the Agreement that Nursa has breached.

Instead, Oxford has made its allegations in an attempt to rewrite the contents of the Agreement. But this is not something this Court can sanction. *See Transit Auth. v. Salt Lake City S. R.R. Co.*, 2006 UT App 46, ¶ 8, 131 P.3d 288 ("Additionally, we will not make a better contract

---

[4] Even if Nursa had a contractual obligation to reimburse payments made by Oxford, and it does not, Oxford has not alleged that it made any payments to Nursa in the first place that could be reimbursed.

for the parties than they have made for themselves. Nor will we avoid the contract's plain language to achieve an 'equitable' result." (internal alterations, quotations, and citations omitted)); *Howe v. Pro. Manivest, Inc.*, 829 P.2d 160, 162 (Utah Ct. App. 1992) ("It is a long-standing rule in Utah that persons dealing at arm's length are entitled to contract on their own terms without the intervention of the courts to relieve either party from the effects of a bad bargain."); *Dalton v. Jerico Const. Co.*, 642 P.2d 748, 750 (Utah 1982) ("Even if the terms of the contract entered into … may not have been profitable … it is not for a court to rewrite a contract improvidently entered into at arm's length or to change the bargain indirectly on the basis of supposed equitable principles."); *see also Systemic Formulas, Inc. v. Kim*, No. 1:07 CV 159 (TC), 2009 WL 4981631, at *3 (D. Utah Dec. 14, 2009) (applying Utah law regarding rewriting contracts).

Under this set of allegations and facts, the Court must dismiss Oxford's breach of contract claim. Just as the Texas-based corporation in *Milestone*, Oxford has entirely failed to point toward any term or clause in the contract that justifies its claim for breach. *See Milestone*, 2021 WL 5007707 at *1, 3; *see also Total Quality Sys.*, 679 F. Supp. 3d at 1207–09 (intimating that the court can compare the allegations in a complaint with an incorporated contract to identify consistency, contradictions, and to confirm whether a breach of contract claim has been sufficiently pled). Thus, because all the allegations regarding breach are either not contained in or contradict the language of the undisputably binding and enforceable Agreement, the Court need not accept the purported terms as true. *See Matney*, 80 F.4th at 1145.

The existence and enforceability of the Agreement is beyond dispute, its express terms have been quoted with consistency, and it is incorporated into the Complaint and the Counterclaim and is properly before the Court. The Agreement does not contain any of the provisions of which

Oxford accuses Nursa of breaching. Accordingly, given the contradictions between the allegations and the governing Agreement, the claim has not been well-pled, is not plausible on its face, and must be dismissed.

## II.    OXFORD'S BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING CLAIM FAILS BECAUSE IT IS BASED UPON AN ATTEMPT TO EXPAND OXFORD'S RIGHTS UNDER THE AGREEMENT

Because Oxford's claim for breach of the implied covenant of good faith and fair dealing ("breach of the implied covenant") attempts to improperly expand the parties' rights under the Agreement, and because Nursa's actions were consistent with the terms of the Agreement, Oxford's claim for breach of the implied covenant of good faith and fair dealing must be dismissed.

"Under the implied covenant of good faith and fair dealing, each party to a contract impliedly promises that [it] will not intentionally or purposely do anything which will destroy or injure the other party's right to receive the fruits of the contract." *Cohen v. Wrapsol Acquisition, LLC*, 177 F. Supp. 3d 1373, 1378 (D. Utah 2016) (internal quotations and citations omitted). But "[i]t is settled law that the covenant of good faith and fair dealing cannot circumvent the plain language of the agreement." *Id.* (internal quotations and citations omitted). Indeed, "Courts have set a high bar for involving the implied covenant and have given it a limited role." *Id.* (internal quotations and citations omitted). A party cannot use the implied covenant to "rewrite the terms of the contract to make it more favorable." *Id.* A party cannot use the implied covenant to "create rights and duties inconsistent with express contractual terms." *Id.* (internal quotations and citations omitted). A party cannot use the implied covenant to overwrite express terms of the contract. *See id.* at 1379. A party cannot claim breach of the implied covenant when its partner "takes action consistent with the contract." *Id.* at 1378 (internal quotations and citations omitted). And a party

cannot use the implied covenant to "compel a contractual party to exercise a contractual right to its own detriment for the purpose of benefitting another party to the contract." *Id.* (internal quotations and citations omitted). Indeed, "it is axiomatic that an implied term cannot contradict an express contract term." *A.I. Transp., Div. of Ins. Co. of State of Pa. v. Imperial Premimum Fin., Inc.*, 862 F. Supp. 345, 348 (D. Utah 1994). As such, to validly assert a claim for breach of the implied covenant, a party must point toward a provision of the contract and assert factual allegations demonstrating a lack of good faith in its performance, *see Strupat v. Aurora Loan Servs. LLC*, No. 2:11CV00279-DS, 2011 WL 2359842, at *3 (D. Utah June 9, 2011), and how such lack of good faith led it to "loose a right that was possessed under the original contract," *see Osmond v. Litton Loan Servicing, LLC*, No. 1:10-CV-11, 2011 WL 1988403, at *1 (D. Utah May 20, 2011).

In *Cohen v. Wrapsol*, for example, a parent company purchased one of its competitors. *Cohen*, 177 F. Supp. 3d 1373 at 1375–76. After the purchase, one of the competitor's founders sued claiming that the parent company had breached the implied covenant by its management and closure of the purchased competitor and miscalculating part of the compensation for the transaction. *Id.* at 1378–79. However, the Court found the cause of action for breach of the implied covenant subject to dismissal because the contract's express terms already defined the parties' rights in relation to the subjects with which the complaining founder took issue. *Id.* On the other hand, in *Strupat v. Aurora*, the Court determined that a plaintiff refinancing applicant failed to plead sufficient supporting factual allegations for a claim for breach of the implied covenant when the refinancing applicant pointed toward no contractual provisions requiring the defendant lender to act as requested. *Strupat*, 2011 WL 2359842, at *3. In *Fitzgerald v. U.S. Bank*, the Court refused to sanction a guarantor's claim for breach of the implied covenant where the defending bank sought

additional payments to which it was entitled under the contract. *Fitzgerald v. U.S. Bank, N.A.*, No. 2:12-CV-1113 TS, 2013 WL 1367047, at *6 (D. Utah Apr. 4, 2013). And finally, in *Osmond v. Litton Loan*, the Court dismissed a claim for breach of the implied covenant where the complaining borrower failed to identify any provision of the contract entitling it to the benefit it sought and in the same act refused to penalize a defending lender for taking advantage of its own rights under the contract. *Osmond*, 2011 WL 1988403, at *2. In each of these cases, the complaining party was unable to demonstrate that the contract entitled them to the benefit sought, or that the defending party had acted beyond its rights under the contract.

For every basis levied to support its claim for breach of the implied covenant, Oxford fails to point toward a contractual right supporting its requested relief, ignores applicable contractual terms, neglects that Nursa has acted consistently with the Agreement, attempts to deprive Nursa of its ability to pursue its own rights under the contract, and seeks to rewrite the contract to avoid unfavorable clauses. None of this should be allowed.

As to the claim that Nursa has charged for services that were not rendered, not only has Oxford failed to point toward any contractual provision entitling it to such an expectation, but again, and to the contrary, the contract makes clear that charges are not contingent upon the rendering of services, but rather upon the verification of shifts that will ultimately be charged to the facility under Agreement sections 9(a) and 9(d). As the Court explained in *Fitzgerald*, like the defending bank in that case, Nursa cannot be penalized for taking advantage of contractual terms that are advantageous to it—i.e., requiring payment to be made based upon verified shifts as opposed to work rendered. *See Fitzgerald*, 2013 WL 1367047 at *6.

As to the repeated assertion that Nursa has been "overcharging for cancellations and

'urgent' booking well above a reasonable market rate." *Counterclaim*, ¶ 64. Oxford again fails to point toward any contractual provision limiting such charges to a market rate, whatever that is, and conveniently ignores the provisions describing pricing fluctuations, *Agreement*, § 9(d), and cancellation fees, § 9(f). What's more, just as the defending lender in *Osmond* and the defending bank in *Fitzgerald*, Nursa has done nothing more than act in accordance with its rights under the contract to obtain the pricing most advantageous to its business model as allowed under the Agreement. *See Osmond*, 2011 WL 1988403, at *2; *Fitzgerald*, 2013 WL 1367047 at *6. As a matter of black-letter law, Oxford cannot employ the implied covenant of good faith and fair dealing to so rewrite the contract.

For the claim that Nursa has refused to reimburse Oxford for healthcare services that went unrendered, Oxford, like the refinancing applicant in *Strupat* and the borrower in *Osmond*, has again failed to point to any contractual provision entitling it to reimbursement for such services. *See Strupat*, 2011 WL 2359842, at *3; *Osmond*, 2011 WL 1988403, at *2. And as explained above, the Agreement's sections 9(a) and 9(d) entitled Nursa to enforce payment obligations on each shift that was verified (either manually or automatically), and upon each invoice charge that was not contested within 30-days. Oxford is not entitled under the Agreement to the benefit it seeks, and to the contrary, Nursa's actions were justified by the Agreement.

And last, as to any assertion that Nursa has failed "to investigate whether it charged for healthcare services that were not rendered, despite receiving written notice from Oxford," *Counterclaim*, ¶ 64, Oxford has again, like the refinancing applicant in *Strupat* and the borrower in *Osmond*, failed to point to any contractual provision entitling it to such an expectation. *See Strupat*, 2011 WL 2359842, at *3; *Osmond*, 2011 WL 1988403, at *2. What's more, while shift

reports are contestable within forty-eight hours, and while invoices are contestable within thirty days, Oxford has not alleged that they provided written notice within those periods, instead claiming to have audited the reports and invoices only *after* Nursa requested satisfaction of payment. Again, under analogous caselaw, the Court cannot fault Nursa for seeking payment under the Agreement, and seeking enforcement of contractual terms which are advantageous too it.

In sum, just like the claims raised in *Cohen*, each claim here is already expressly governed by the contract and is thus not subject to an implied right or implied covenant beyond that which has been dictated by the Agreement's language. *See Cohen*, 177 F. Supp. 3d 1373 at 1378–79. Moreover, in each instance, like the complaining refinancing applicant in *Strupat* and the borrower in *Osmond*, Oxford has failed to point toward any provision of the Agreement supporting the benefit or right it seeks to vindicate. *See Strupat*, 2011 WL 2359842, at *3; *Osmond*, 2011 WL 1988403, at *2. And finally, just as the defending lender in *Osmond* and the defending bank in *Fitzgerald*, Nursa has done nothing more than take advantage of those benefits properly available to it under the Agreement. *See Osmond*, 2011 WL 1988403, at *2; *Fitzgerald*, 2013 WL 1367047 at *6.

Although Oxford may believe that the Agreement was not favorable to it in the first place, Oxford cannot now use the implied covenant to "rewrite the terms of the contract to make it more favorable." *Cohen*, 177 F. Supp. 3d at 1378 (internal quotations and citations omitted). Because the Agreement does not support the implied rights that Oxford seeks to vindicate, and because in many instances the requested right contradicts the terms of the Agreement, the claim for breach of the implied covenant must be dismissed. *See A.I. Transp.*, 862 F. Supp. at 348 ("It is axiomatic that an implied term cannot contradict an express contract term.").

Finally, all other reasons aside, the Utah Supreme Court has stated, "A claim for breach of the covenant of good faith and fair dealing is a derivative of [a] breach of contract claim." *Am. W. Bank Members, L.C. v. State*, 2014 UT 49, ¶ 19, 342 P.3d 224. Where a plaintiff does "does not alleged the existence of facts required to plead a breach of contract, it has also failed to plead a breach of the covenant of good faith and fair dealing. *Id.* Here, as explained *supra*, Oxford has failed to properly allege a breach of contract claim and has thus also failed to properly plead a claim for breach of the implied covenant. If for no other reason, the cause of action should accordingly be dismissed.

## III.   THE UNDISPUTED EXISTENCE OF A BINDING CONTRACT PRECLUDES EQUITABLE RELIEF

Although Oxford has included a claim for unjust enrichment, the very allegations in the Counterclaim proclaiming the existence of a valid, binding, enforceable agreement—the same Nursa™ Terms of Service Agreement presented in Nursa's Complaint—render this cause of action dispositively unavailable. In other words, because Oxford agrees with Nursa that the parties' Agreement, the Nursa™ Terms of Service Agreement, is binding, equitable relief is unavailable even in the alternative.

"Unjust enrichment is only available as an equitable remedy where one does not exist at law. If a legal remedy is available, such as breach of an express contract, the law will not imply the equitable remedy of unjust enrichment." *Anapoell v. Am. Express Bus. Fin. Corp.*, No. 2:07-CV-198-TC, 2007 WL 4270548, at *5 (D. Utah Nov. 30, 2007) (internal quotations and citations omitted). "Rule 8 explicitly states that complaints can include claims for relief in the alternative, but where an express contract covering the subject matter of the litigation exists, recovery for unjust enrichment is not available." *Hiatt v. Brigham Young Univ.*, 512 F. Supp. 3d 1180, 1188 (D.

Utah 2021) (internal quotations and citations omitted). "The issue is not whether [a party] has a valid breach of contract claim, but whether an enforceable contract exists that provides the possibility of a legal remedy. Unjust enrichment affords relief to a party that has been harmed outside the context of a contractual relationship." *Anapoell*, 2007 WL 4270548, at *6. Thus, where "there is no dispute that a valid enforceable contract exists, and that such contract covers the subject matter of the litigation" an unjust enrichment claim "fails as a matter of law." *Id.* at *5.

For example, in *Anapoell v. American Express*, after leasing medical equipment and opting to pay the lessor for applicable insurance, the complaining doctor raised class allegations asserting that the option to allow the lessor to pay for insurance was part of a concocted scheme to increase its profits. *Anapoell*, 2007 WL 4270548, at *1–3. However, because both parties agreed on the existence of a valid enforceable contract and that the contract applied to the subject matter of the litigation, a claim for unjust enrichment was not sufficiently pled, even in the alternative. *Id.* at *5–6. On the other hand, in *Hiatt v. Brigham Young University*, a student claimed that the school had an obligation to provide in-person classes but failed to do so during the COVID-19 pandemic. *Hiatt*, 512 F. Supp. 3d at 1183–84. Because the parties did not yet agree on the existence of a contract, the claim for unjust enrichment was properly pled in the alternative. *Id.* at 1188. In sum, whether the claim can properly be pled in the alternative is dependent upon whether the parties agree on the existence of a valid, binding, and enforceable contract.

Here, just like the parties in *Anapoell*, *see Anapoell*, 2007 WL 4270548, at *1–3, and unlike the parties in *Hiatt*, *see Hiatt*, 512 F. Supp. 3d at 1183–84, both parties have plainly alleged the existence of a valid contract and their agreement on its binding nature and enforceability. In fact, Nursa and Oxford have plainly alleged specific terms of that Agreement (the Nursa™ Terms of

Service Agreement) and included it as an exhibit to be incorporated into the pleadings. *Complaint*, ¶¶ 1, 42, Exh. 1; *see also id.* ¶ 42 ("The Agreement is a valid and enforceable contract between Nursa on one hand, and Oxford on the other."); *Counterclaim*, ¶¶ 10, 62, Exh. 1; *see also id.* ¶ 62 ("In or about June 2022, Oxford and Nursa entered into the Agreement, which is a valid and binding contract."). In other words, the parties agree on the existence of a valid contract, that the contract is binding, that the contract is enforceable, that the contract has a specific form and specific language, and that the contract governs the dispute here. As a result, if Oxford is entitled to relief at all, it will receive that relief as a result of the contract, and equitable claims have no place in these proceedings.

For this reason alone, the Court must apply its prior precedent and dismiss the unjust enrichment claim in the face of stipulations regarding the existence of a valid, binding, enforceable, and finite agreement, which encompasses the subject of these proceedings.

## CONCLUSION

For the foregoing reasons, the Court should dismiss the Counterclaim with prejudice.

DATED: April 19, 2024

KUNZLER BEAN & ADAMSON, PC

*/s/ R. Jeremy Adamson*
R. Jeremy Adamson
Taylor J. Smith

*Attorneys for Plaintiff and
Counterclaim Defendant*

**CERTIFICATE OF SERVICE**

I hereby certify that on the 19th day of April 2024, I electronically filed and served a true and correct copy of the foregoing **MOTION TO STRIKE CLASS ALLEGATIONS AND DISMISS COUNTERCLAIMS** upon counsel of record via the Court's CM/ECF system.

*/s/R. Jeremy Adamson*
R. Jeremy Adamson